IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal Case No. 1:16-cr-163 |
| v. ) | |
| ) | Hon. Liam O'Grady |
| MOHAMED BAILOR JALLOH. ) | |
| ) | Sentencing Hearing: February 10, 2017 |
| ) | |
| Defendant. ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, by and through its attorneys, Dana Boente, United States Attorney for the Eastern District of Virginia, John T. Gibbs, Assistant United States Attorney, Brandon L. Van Grack, Special Assistant United States Attorney, and Jolie Zimmerman, Trial Attorney for the National Security Division's Counterterrorism Section, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("U.S.S.G." or the "Guidelines") § 6A1.2, files this Position of the United States with Respect to Sentencing of the defendant, Mohamed Jalloh. The United States submits that the recommended Guidelines sentence of 240 months would be sufficient and not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a).

I.    **FACTUAL BACKGROUND**

On October 27, 2016, the defendant pleaded guilty to a one count criminal information charging him with attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The charges and plea stem from the defendant's actions, beginning in June 2015, to support the Islamic State of Iraq and the Levant ("ISIL"), a foreign terrorist organization that has called for attacks against United States citizens, including

members of the military. The defendant attempted to support ISIL in multiple ways, on multiple occasions, for over a year, both in Africa, as well as here in the United States.

*The Defendant's First Attempt to Join ISIL*

Beginning in June 2015, after having traveled to his native country of Sierra Leone, the defendant communicated with a prominent online ISIL supporter who put the defendant in contact with a known ISIL facilitator in Africa whose role was to send recruits to Libya to join ISIL. PSR at ¶8 Subparagraphs 5-6.

In August 2015, the defendant, having traveled to Nigeria from Sierra Leone, met, and stayed with, the ISIL facilitator for approximately two weeks. During this two-week period, the defendant waited to be taken to Libya where he could join ISIL. Ultimately, due to repeated delays in getting the defendant to Libya, he left the known ISIL facilitator in Nigeria, and traveled instead to visit a family friend. PSR at ¶8 Subparagraph 7.

*The Defendant's Second Attempt to Join ISIL*

By September 2015, the known ISIL facilitator was in Niger where he had another group of potential ISIL recruits that he was attempting to transport to Libya to join ISIL. The defendant re-connected with the known ISIL facilitator at that point. PSR at ¶8 Subparagraph 8. The defendant decided that he still wanted to join ISIL, so the defendant reunited with the known ISIL facilitator and his group of recruits in Niger. The defendant boarded a truck that would take him and the other recruits from Niger, through the Sahara desert, and into an ISIL-controlled area of Libya. The known ISIL facilitator did not join the defendant on the truck destined for Libya, but before parting, the defendant gave the known ISIL facilitator $100 to help him get back to Nigeria. PSR at ¶8 Subparagraph 9.

*Providing Money to Get ISIL Recruits into Libya*

In November 2015, the defendant re-connected with the known ISIL facilitator and told the ISIL facilitator that he had abandoned the truck bound for Libya because he decided he was not ready to fight for ISIL. PSR at ¶8 Subparagraph 10. However, the defendant stayed in contact with the known ISIL facilitator, and he learned in December 2015 that the known ISIL facilitator was in Nigeria attempting to get another group of prospective ISIL recruits to ISIL-controlled territory. To assist with this trip, the defendant provided local currency worth approximately $341.04 to the known ISIL facilitator. The known ISIL facilitator later told the defendant that he had successfully gotten this group of ISIL recruits to ISIL-controlled territory in Libya. PSR at ¶8 Subparagraph 12.

*Coming in Contact with Sudani*

Before he left Sierra Leone and returned to the United States, the defendant came in online contact with Abu Saad Sudani ("Sudani"), an individual whom the defendant understood was an ISIL figure engaged in plotting attacks in the United States. PSR at ¶8 Subparagraph 13. In January 2016, the defendant left Sierra Leone and returned to the United States. PSR at ¶8 Subparagraph 12.

*Providing Money to Sudani*

In the spring of 2016, the defendant communicated on multiple occasions with Sudani about sending him money to support ISIL. Ultimately, the defendant sent money to a contact of Sudani's through a family member in Sierra Leone in order to conceal the transaction. Utilizing this method, the defendant sent $250 to the ISIL contact on March 18, 2016, and $450.63 on April 12, 2016. PSR at ¶8 Subparagraph 13.

*Providing Money to an FBI Undercover Employee*

In May and June 2016, the defendant continued to discuss his interest in providing money to ISIL. As a result, he was put in touch with an undercover FBI employee posing as a member of ISIL living overseas. PSR at ¶8 Subparagraph 29. On June 11, 2016, the defendant sent $50 worth of gift card codes intended for use by ISIL to the undercover FBI employee, and wrote, 'let me know if you need more (gift cards).' PSR at ¶8 Subparagraph 39. On June 20, 2016, the defendant sent another $500 in cash for use by ISIL to the undercover FBI employee whom he believed was a member of ISIL. PSR at ¶8 Subparagraph 49.

*Plotting an Attack on US Military Personnel in the United States*

By March 2016, Sudani was actively plotting an attack in the United States that he hoped the defendant and a second individual located in the United States ("CHS1") would carry out. Unbeknownst to Sudani and the defendant, CHS1 was an FBI source. On April 9, 2016 and May 1, 2016, the defendant met with CHS1 in the Eastern District of Virginia, and the two of them discussed potential attack operations. During the meeting on April 9, the defendant told the CHS that Mohamed Yousuf Abdulaziz, the terrorist who killed five member of the US military in Tennessee in 2015 was a "very good man." PSR at ¶8 Subparagraph 17. The defendant also told the CHS in the April 9th meeting that he thinks about conducting an attack all the time, that he was close to doing so at one point, that he knew how to shoot guns and that he had been thinking about conducting an attack similar to the one committed by Nidal Hassan, the US Army Major who killed 13 and injured 32 in a terrorist attack in Fort Hood, Texas in 2009. PSR at ¶8 Subparagraph 18.

During their second in-person meeting in May, the defendant asked about the timeline for the operation. The defendant suggested to the CHS that Ramadan was a good time to conduct an attack, and he said that he was working on himself to ensure his heart would be strong and not fail

him at the moment when it was needed most. PSR at ¶8 Subparagraph 23. In order to demonstrate his commitment to potential attack operations, the defendant told the CHS that it was something he had thought about, and he had even purchased a handgun. Investigation revealed that this statement by the defendant was true, and that he had, in fact, purchased a Glock 19 handgun in the Eastern District of Virginia on February 13, 2016, two months before he first met with the CHS. PSR at ¶8 Subparagraph 25.

At one point, the defendant and CHS1 discussed the support that the defendant could provide if he decided not to participate in an operation, and the defendant suggested providing money or weapons. The defendant said he had a family member in North Carolina with access to weapons, specifically AR-15's and AK-47's. PSR at ¶8 Subparagraph 26. On May 15, 2016, CHS1 told the defendant about a plot to murder US military personnel and then conduct a follow-on martyrdom operation. CHS asked the defendant what sort of weapons his family member in North Carolina could provide for $1,500. The defendant asked if CHS1 wanted pistols or AK-47's. He also said, "I will support you with whatever you need from me, I need the reward from Allah and my sins to be forgiven." PSR at ¶8 Subparagraph 30.

In June 2016, the defendant traveled to North Carolina to attempt to obtain a weapon for the plot to murder US military personnel. The defendant met with an individual in North Carolina who owned an AK-47, and he offered to buy it. However, the owner of the gun refused to sell it. PSR at ¶8 Subparagraph 45. On June 19, 2016, the defendant told CHS1 that he had been unable to buy that particular weapon in North Carolina, but CHS1 should be patient and he would get him something nice. PSR at ¶8 Subparagraph 47.

On July 2, 2016, the defendant purchased a Stag Arms AR-15 rifle from a local gun store and he was arrested the next day. PSR at ¶8 Subparagraphs 54-55. In the weeks leading up to

his purchase of the AR-15, the defendant conducted a number of troubling Internet searches. These included a search of an on-line news story entitled, "Buying an AR-15 gun like the one used in the Orlando massacre is easy in many states," (PSR at ¶8 Subparagraph 43), an Internet search about Omar Mateen, the Orlando gunman, and the rifle he used in that attack (PSR at ¶8 Subparagraph 44), searches for "Orlando Shooting Weapon" and information about AR-15's, the type of rifle used in the Orlando attack (PSR at ¶8 Subparagraph 53). The defendant also viewed news stories entitled, "223 caliber, is it effective?" and "Marine: 223 May Not Be Lethal Enough for Civilians." PSR at ¶8 Subparagraph 53.

## II.  STANDARDS GOVERNING SENTENCING

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence"). In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of

the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." United States v. Simmons, 269 Fed. Appx. 272, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007)). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Cuthrell, No. 12-4077, 2012 WL 3643677, *1 (4th Cir. Aug. 27, 2012) (citing United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009)). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)). Courts "are not left with unguided and unbounded sentencing discretion." United States v. Green, 436 F.3d 449, 455 (4th Cir. 2006). Instead, at sentencing a court "must first calculate the Guidelines range." Nelson v. United States, 555 U.S. 350, 351 (2009); see also United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005) (holding that a sentencing court is still required to "'consult [the] Guidelines and take them into account when sentencing'" (quoting Booker, 543 U.S. at 264)).

## III. SENTENCING CONSIDERATIONS

### A. Acceptance of Responsibility

In accordance with Section 6A1.2 of the Guidelines and Policy Statements and this Court's policy regarding Guidelines sentencing, the United States hereby represents that it has reviewed the United States Probation Office's presentence report ("PSR") prepared in this matter. The

United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b), to grant the defendant an additional one-level reduction in the offense level for acceptance of responsibility, if the defendant receives a two-level reduction for acceptance of responsibility. The government states that the defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

### B. Sentencing Guidelines

The government agrees with the Probation Office's Guidelines calculations. The Probation Office calculated that the defendant's Total Offense Level is 40 and Criminal History Category is VI, resulting in a recommended Guideline sentence of 360 months to life. Since the statutory maximum for a conviction of 18 U.S.C. § 2339B is 240 months, the sentence is limited by statute to 240 months (20 years).

> *Section 2M5.3(b)(1) applies because the defendant provided material support to ISIL with the intent, knowledge, and reason to believe it would be used to assist in the commission of a violent act.*

The Probation Office recommends, and the government agrees, that pursuant to 2M5.3(b)(1)(E) the offense level should increase by two levels because the defendant attempted to provide material support or resources to ISIL with the intent, knowledge, or reason to believe it would be used to commit or assist in the commission of a violent act. This particular Guideline enhancement is met when the "offense involved the provision of…(E) funds or other material support or resources with the intent, knowledge, or reason to believe that they are to be used to commit or assist in the commission of a violent act."

In this case, the defendant attempted to provide material support to ISIL in a host of ways. He provided funds to ISIL, and he also attempted to provide weapons and personnel. It

strains credulity to suggest that the defendant would not be aware that his support and attempts to provide additional support were going to a group that committed violent acts. But even if, for the sake of argument, he was not aware of that fact, he need only have *reason to believe* they were to be used in a violent act. Given that he tried to buy an assault rifle for CHS1's plot to murder US military personnel, and given how notorious ISIL is for committing horrendous acts of violence on a regular basis, this enhancement clearly applies.

### C.  18 U.S.C. Section 3553(a) Factors

After calculating the appropriate Guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" United States v. Moreland, 437 F.3d 424, 432 (4th Cir. 2006) (quoting Green, 436 F.3d at 455). Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in Section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

### D.  Argument

The recommended Guidelines sentence of 20 years of imprisonment appropriately reflects the seriousness of the offense, the critical need to deter this type of conduct, and the defendant's clear knowledge of and intent to commit the harms he inflicted.

*Seriousness of the Offense*

The defendant's actions were exceedingly serious. They spanned a year, and during that time, the defendant attempted to provide material support to ISIL in a number of different ways. Twice he attempted to provide himself as personnel to ISIL.  Both attempts did not involve undercover law enforcement agents. The defendant was communicating with, and interacting with, real ISIL facilitators in Africa.  US law enforcement had no idea of the defendant's actions at that point.

Although the defendant ultimately did not join ISIL in Libya, his desire to support this terrorist organization did not cease.  He gave money to ISIL, knowing that it was to be used to help get recruits to ISIL-controlled territory. He was later told that that money had, in fact, helped in getting those recruits to ISIL.  He came in on-line contact with Sudani, an ISIL member interested in attack plotting in the United States.

Fortunately, after his return to the United States, Sudani put the defendant in touch with a person who turned out to be an FBI source.  It was the result of Sudani's actions in brokering the introduction with CHS1 that the FBI learned that the defendant was eager to provide material support to ISIL.  Over the next several months, the defendant attempted to provide money to ISIL.  More chillingly, though, he also attempted to obtain an AK-47 assault rifle for CHS1 as part of what he believed was a plot to murder members of the US military.  In fact, the defendant drove all the way to the Charlotte, North Carolina area to try to make an offer for an untraceable gun.  And during his discussions with CHS1, the defendant said that attack operations were "100 percent the right thing" to do. PSR at ¶8 Subparagraph 27.

The defendant's conduct is particularly reprehensible because he attempted to target people for their service to our country. In the United States we hold military members in the highest regard because of the sacrifices they make to defend our country and preserve our way of

life. We also respect our public servants who spend their lives furthering the public good. The defendant, who previously served in the Virginia Army National Guard for six years, and who received an honorable discharge, knew better than most the sacrifices that our men and women in uniform make. Yet when offered a chance to take part in an operation targeting members of the military, he willingly chose to participate, even to the point of trying to obtain a rifle for such an attack. A 20-year sentence would signal that, when given the opportunity, our justice system protects and serves the military members and civil servants, just as they spend their lives protecting and serving us.

### i. *Need for Adequate Deterrence*

The defendant's actions represent an evolving terrorist threat that requires a substantial sentence to deter others from making the same choice. This defendant is bright and capable. He demonstrated an ability to use modern forms of communication to make contact with real ISIL facilitators in Africa, including people such as Sudani, who was interested in plotting attacks in the United States, and the known ISIL facilitator, who successfully transported recruits to ISIL-controlled territory. The fact that these two individuals were so trusting of the defendant, demonstrates that he had proven himself to be a worthy contributor to the goals of ISIL.

And though he failed to join the organization as a fighter, he also did not renounce his support for the organization. Far from it, he kept returning to the same pattern of trying to assist ISIL with money or weapons. As he told CHS1, he viewed his support for ISIL as a way to have his sins forgiven. PSR at ¶8 Subparagraph 30.

In sentencing the defendant, this Court has the ability to send a clear message to others who would go to such great lengths to attempt to support a foreign terrorist organization. A

sentence of 20 years of imprisonment would communicate that the United States has zero tolerance for attempting to support such a violent, depraved group as ISIL.

    *ii.    Similarly Situated Defendants*

As noted above, this is a unique case. Often defendants who attempt to provide material support are arrested at the time of their first attempt, whether it be attempting to fly out of the country to join ISIL, or attempting to send money to ISIL, or attempting to obtain weapons for ISIL. In this case, though, the FBI was not aware of any of the defendant's actions in Africa. He was operating with a free hand when he interacted with Sudani and the known ISIL-facilitator overseas. It demonstrates how resolute he was in wanting to support ISIL, that even after he decided he was not yet ready to serve as a foot soldier for ISIL, he found many other ways to try to help the group.

Given this unique fact pattern it is impossible to find any cases directly on point. The most analogous case may be United States v. Elfgeeh, 6:14cr 6147 (EAW), See also, 2016 WL 1055626 from the Western District of New York. In that case, Elfgeeh was sentenced to 270 months (22.5 years) for a guilty plea to two counts of attempting to provide material support to ISIL. The attempted material support consisted of attempting to assist three individuals (two of whom were working with the FBI) in traveling overseas to join ISIL. In addition, Elfgeeh sought to take part in a plot to kill members of the US military by buying two handguns equipped with silencers as well as ammunition from a CHS. United States v. Lutchman, 2017 WL 371894, Par. 26-28 (WDNY 2017). These facts, while not identical to what the defendant did in this case, are quite similar. Elfgeeh tried to help three people join ISIL. The defendant twice tried to join ISIL, and he gave money to help other people go join ISIL. Elfgeeh obtained weapons and ammunition for an undercover plot to kill members of the US military. The defendant made an

offer to buy an assault rifle for an undercover plot to kill members of the US military. Given the similarities to what Mufid Elfgeeh did, the recommended sentence of 20 years for this defendant is appropriate.

### iii. *Characteristics of the Defendant*

The defendant's characteristics likewise favor a sentence of 20 years of imprisonment. He is an intelligent young man who was fully aware of the consequences of his actions. His skills and intelligence are manifested by the fact that he gained the trust of someone like Sudani so quickly. And he rewarded that trust by providing and attempting to provide money to ISIL, and by attempting to obtain a gun for a murder plot here in the United States.

The defendant was fully aware of what he was doing, and the consequences of those actions. His only misgivings seemed to be a fear that he would waver at the critical moment. But as to the notion of assisting in a plot to murder members of the US military, it is telling that he told CHS1 conducting an operation was not supposed to be easy because it is a test, and attaining paradise or 'Jannah' is also not easy. PSR at ¶8 Subparagraph 30. By putting the idea of this murder plot into religious terms, and by suggesting that murdering members of the US military would be a path to heaven, the defendant showed how strongly committed he was to the deadly ideology of ISIL.

The defendant should be imprisoned for a sufficient period of time to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. The defendant should be sentenced to 20 years of imprisonment.

## IV. CONCLUSION

For the reasons above, the Government submits that a sentence of incarceration of 20 years of imprisonment would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/
John T. Gibbs
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Email: john.gibbs@usdoj.gov

Brandon L. Van Grack
Special Assistant United States Attorney (LT)
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Email: brandon.van.grack2@usdoj.gov

Jolie Zimmerman
Trial Attorney
U.S. Department of Justice, National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that on this 2d day of February, 2017, I filed the foregoing pleading with the Clerk of Court and will send an electronic copy of such pleading to counsel of record via email.

    Respectfully submitted,

    Dana J. Boente
    United States Attorney

By:    /s/
    John T. Gibbs
    Assistant United States Attorney
    Eastern District of Virginia
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    Phone: (703) 299-3700
    Email: john.gibbs@usdoj.gov