## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 1:16-cr-163 (LO)** |
| **MOHAMED BAILOR JALLOH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY TO GOVERNMENT'S
## POSITION WITH RESPECT TO SENTENCING

**COMES NOW** the Defendant, Joseph Hassan Farrokh, by counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G."), respectfully submits this reply in response to the United States' Position with Respect to Sentencing (Doc. 48), and in support of his own Memorandum in Aid of Sentencing (Doc. 49), and the relief sought therein.

## I.    FACTUAL BACKGROUND.

Mr. Jalloh has pleaded guilty to attempting to provide material support to a terrorist organization, in violation of 18 U.S.C. § 2339B, has debriefed extensively with authorities, and takes responsibility for his offense, (Doc. 49, Ex. A) but, as set forth in his sentencing memorandum, every action he took came at the direction, urging, or importuning of another person and, in each instance, he was susceptible to those influences due to his gullibility, emotional impairments, and psychological vulnerability. (Doc. 49, at 11-14, 18-22.) This was not offered as a defense, excuse or justification, but merely as mitigating aspect of offense and his history and character. Throughout its memorandum to the Court, however, the United States

does not address these issues at all, but rather portrays Mr. Jalloh's actions in clear, purposeful, and unconflicted terms. This portrayal is inaccurate and has the effect of implying that Mr. Jalloh was a radicalized terrorist, acting on his own initiative. Nothing could be further from the truth.

Every action Mr. Jalloh took that comprises the facts supporting his conviction, from his initial flirtation with ISIL until his arrest, came at the behest of others, often in extremely persistent ways. For instance, after returning from Sierra Leone, Mr. Jalloh was introduced to CHSI, for the explicit purpose of meeting a Muslim woman to marry. Unbeknownst to Mr. Jalloh, CHSI was an informant for the FBI and was also communicating with an ISIL facilitator and discussing committing a domestic terrorist operation. Following this introduction, Mr. Jalloh made clear that he was seeking a wife, and CHS1 said he could help, but he sought to move the conversation to discussing an "operation" thereby using Mr. Jalloh's desperate desire to wed as a carrot to induce his assent to participate.  A digital communication from April 2, 2016, well-illustrates the essential nature of their communications.

| CHS1: | Akhi, is ur family gonna join in on da operation? |
| Jalloh: | U mean abu Dujannah marriage[?] |
| CHS1: | No operation. |
| Jalloh: | Akhi u didn't tell me about [an] operation. |
| CHS1: | Akhi there is marriage. |

From the outset of CHS1's effort to enlist his assistance, Mr. Jalloh expressed hesitation and ambivalence which prompted CHS1 to increase the pressure to extract a commitment. After this pressure appeared to make Mr. Jalloh withdraw, CHS1 would pull back and then reassert himself. This push-pull is exemplified their communications from April 22, 2016, when CHS1

2

re-initiated a text dialogue by asking Mr. Jalloh "how are you doing" and acknowledging that "may be last time I pushed too hard." In an apparent attempt to ameliorate the perceived harm to their relationship and overcome Mr. Jalloh's obvious ambivalence, CHS1 shared his experience about being nervous when he was first asked to participate, proselytlized Mr. Jalloh, and then encouraged him to pray that "Alahh show [him] the right way [because] the kufar is doing in Islam killing innocent people". In response, Mr. Jalloh deflects, as he often did, claiming the pressure did not make him "feel any type of way," acknowledging he wanted "live a good Muslim life" but making clear he could not "commit to something and [] fail or falter."

Eventually, Mr. Jalloh explicitly declined CHS1's repeated invitations to participate in an operation, but when he did, CHS1 seemlessly began importuning Mr. Jalloh to purchase a weapon for him (CHS1) to use. As noted previously, Mr. Jalloh eventually and reluctantly acceded to these demands, enduring CHS1's pressure and hectoring along the way and made two clumsy efforts to purchase a weapon, before buying one without disclosing the purchase to CHS1. Throughout all of their communications Mr. Jalloh exhibited both a reluctance to participate, a vulnerability to CHS1's manipulation, and a view that his marriage to a Muslim woman would somehow make things right with Allah. Far from being the actions of a radicalized terrorist, Mr. Jalloh's pliant, non-committal responses and apathetic gestures of support evidence an impaired and impressionable young man seeking to please an older, wiser Muslim who was used the promise of a wife (and a solution to his misery), to encourage the commission of a crime. These exchanges are also characteristic of Mr. Jalloh's communications with the other ISIL operatives as well, and bely the Government's suggestion Mr. Jalloh acted as a free agent, taking initiative and acting independently of others.

In this vein, Mr. Jalloh suggests that the following examples in the Government's sentencing memorandum overstate both his motivation and independence:

At page 2, paragraph three, the Government asserts Mr. Jalloh traveled to Nigeria to meet and stay with an ISIL facilitator and, thereafter, waited for two weeks to be taken to Libya. While technically true, the omission of critical facts overstates Mr. Jalloh's ideological commitment. Mr. Jalloh did travel to Nigeria, but he did so at the behest of an ISIL facilitator who was actively recruiting him to join, and even then, he traveled not to join ISIL, but because he was considering joining. Further, he was instructed to go so that he could be proselytized and convinced, not because he was committed to the cause. While Mr. Jalloh acknowledges his "cognitive openness" is sufficient to constitute an attempt, it is a far cry from real terrorists single-minded commitment to extreme ideology and violence.

On page 3, paragraph one, the Government asserts Mr. Jalloh "re-connected with the known ISIL facilitator". Because it was the known ISIL facilitator who initiated this contact, the omission of that fact overstates Mr. Jalloh's actions and motivation. Similarly, the discussion of Mr. Jalloh's payment later in the same paragraph also omits the fact the ISIL facilitator was the one who initiated the request, indicating he needed funds, and that Mr. Jalloh provided the funds largely because he was ashamed he could not follow through with his prior feeble attempt to join ISIL. Importantly, at no point did Mr. Jalloh or the ISIL facilitator reference the use of the funds would be used to commit violence.

In the next paragraph, the Government asserts that before he "left Sierra Leone" Mr. Jalloh "came in an online contact with … Sudani … whom [he] understood was … engaged in plotting attacks in the United States." This single assertion gives the impression Mr. Jalloh knew while in Sierra Leone that Sudani was plotting attacks. That is not accurate because Mr.

Jalloh was unaware of Sudani's intention until after his return to the United States. Thus, while both of the clauses of this sentence are technically accurate, the conflation of two sentences from the PSR into a single sentence, erroneously compresses the timeline regarding what Mr. Jalloh knew and when and, thereby, makes him appear more extreme and culpable.

On page 4, paragraph two, the Government references the meetings between Mr. Jalloh and CHS1, but omits to mention that the explicit purpose for these meetings was to find a Muslim wife for Mr. Jalloh. While it is true CHS1 attempted to enlist Mr. Jalloh in a potential attack, Mr. Jalloh did not have a "discussion" about an attack, or agree to participate. Rather, CHS1 talked about it and pressured Mr. Jalloh to commit as an implicit quid-pro-quo for finding him a bride. Mr. Jalloh never agreed to an attack and expressed ambivalence about participating only to please CHS1.

Mr. Jalloh is guilty of having attempted to provide material support to ISIS, and he takes responsibility for his crime. He is not, however, a unreformable extremist, much less a terrorist, and he did not take the initiative for any of the offense conduct on his own initiative. Because he acquiesced, his conduct violated the law, but Mr. Jalloh was a troubled young man who misguidedly acquiesced to the will of others during acute periods of personal crisis. Thus, while he will be punished, the ultimate sentence should reflect not only what he actually did, but the circumstances and ambivalent motivations under which he committed those actions.

## II.      SENTENCING CONSIDERATIONS.

It its discussion of similarly situated defendants, the Government ignores the numerous defendants in the Eastern District and across the United States who were more radicalized, more culpable, and demonstrated an unflinching commitment to ISIS, who received sentences of around 100 months or less. Instead, the United States cites only two disparate cases, *United*

*States v. Elfgeeh* and *United States v. Lutchman*, contending *Elfgeeh* is the "most analogous". Even the most superficial review of these cases reveal they have no application here.

*United States v. Elfgeeh,* 6:16-cr-06147 (W.D.N.Y.)

Mufid A. Elfgeeh was a prolific online terrorist recruiter, a fervent online ISIL supporter, and a facilitator who, in addition to attempting to raise a small fighting force to send abroad, provided logistical, tactical and communications support during an actual siege in Syria. 6:16-cr-06147, Doc. 39, at 29. In addition to his multifaceted role providing materials and tactical support in the war abroad, Elfgeeh purchased two weapons with silencers for his own personal use so he could murder American soldiers. 6:16-cr-06147, Doc. 1, at 2-11. Critically, Elfgeeh took every criminal action on his own initiative, was indisputably radicalized and extreme, and due to the broadness of his endeavors, was indicted for ten crimes in two separate indictments. His charges included three counts of Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339A, one count of Attempting to Kill Officers and Employees of the United States, in violation of providing 18 U.S.C. §§ 1114(3) & 1113, one count of Possession of Firearms and Silencers in Furtherance of a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) & 924(c)(1)(B)(ii), two counts of Possession of an Unregistered Firearm Silencer, in violation of 18 U.S.C. §§ 5841, 5861(d), & 5871, and three counts of Assault, in violation of 18 U.S.C. §§ 111(a) & 111(b). 6:16-cr-06147, Doc.12, at 1-5; Doc. 39, at 2 n.1.

Based on the scope of the charges alone, the case is not a valid point for comparison. Indeed, a fair consideration of the underlying facts actually supports a significalty lower period of imprisonment for Mr. Jalloh. In early 2013, Elfgeeh began operating dozens of online accounts – Twitter, Facebook, WhatsApp, etc. - that he used as a platform to receive and

disseminate information about terrorist groups, their activities in Syria and other countries, to proclaim in support for violent jihad, ISIL and other foreign terrorist organizations and their leaders, and to inspire other to join the war in support of ISIL. By December, 2013, Elfgeeh became an active recruiter for ISIL and used his broad platform to recruit numerous individuals to the cause. 6:16-cr-06147, Doc.12, at 2-3; Doc. 31, at 6-7. From 2013 until his arrest on May 31, 2014, Elfgeeh actively recruited several individuals to travel to Syria and join the fight with ISIL by showing them propaganda videos, paying for the procurement of travel documents, purchasing a laptop computer with a high definition camera to take abroad, counseling and radicalizing the recruits, providing them with information about how to avoid detection by law enforcement, advising them about the process of joining ISIL, putting them in touch with ISIL operatives in various countries, vouching for them, and coordinating their travel, among other things. *Id.* at 4-5. The explicit purpose of these efforts was to radicalize the recruits to travel overseas and join violent jihad, and to identify multiple individuals who would go and/or send money to support their efforts. *Id.* 5-6.

In addition to creating and helping fund a ready-made fighting force for ISIL, Elfgeeh injected himself into an ongoing offensive in in Homs, Syria, to provide critical communications and logistical support in support of the Kalifate. In March, 2014, Elfgeeh was contacted by a Syrian national jihadist in Western Syria, on behalf of the Green Battalion of the United Rebels-Al-Murabitun ("Green Battalion"), in an effort to break a blockade on Homs. The Green Battalion commander indicated he needed armaments – ammunition, mortar shells, and explosives sufficient to penetrate armored vehicles to break the blockade. 6:16-cr-06147, Doc.12, at 6-7. In addition to encouraging the Green Battalion to work with ISIL, Elfgeeh used

his online contacts to quickly identify an appropriate ISIL commander, broker an introduction between the two factions, and later a direct communication between ISIL leadership. *Id.* at 7-8.

In addition to his prolific logistical support for ISIL, Elfgeeh also plotted separately to murder members of the United States armed forces returning from Iraq, and Shi'a Muslims living in Western New York. To implement that plan, Elfgeeh purchased two handguns equipped with unregistered firearm silencers and ammunition.  6:16-cr-06147, Doc. 1, at 2, 6-7. Claiming to already own a bulletproof vest, Elfgeeh made his intent to commit a large-scale terrorist act on his own clear in his many on-line posts and communications. *Id.* at 6. Elfgeeh's determination to procure these weapons to murder Americans is not only evidenced by his communications, but by his persistent, unrelenting actions. From his first known attempt to procure the weapons on December 9, 2013, until his successful purchase on May 31, 2014, Elfgeeh, made numerous serious attempts to get assault weapons through multiple individuals, *id.* at 6-11, all the time praising people who had previously killed Americans, and intimating that he had a specific plan to kill as many as fifteen people. *Id.* at 9-11.

For all of these activities, Elfgeeh received an agreed sentence of 270 months in exchange for his guilty plea to two counts of providing material support. As part of the plea agreement, the United States dismissed eight other serious criminal charges, including attempted murder and assault, and Elfgeeh was precluded for arguing for a sentence below 270 months. Critically, the plea agreement precluded the defendant from arguing, or the Court from considering, any downward departure under the sentencing, including that the guideline sentence overstates his career criminal category under USSG § 4A1.3.

*Elfgeeh* is inapposite because the defendant was an extremely sophisticated and influential blogger who operated mutliple pro-ISIL platforms that he utilized to radicalize and

recruit multiple followers to join ISIS and engage in jihad. Through this medium, Elfgeeh articulated his vision of radical jihad, identified multiple recruits, raised money for specific operations, and ultimately assisted in a military offensive by coordinating communications between two terrorist factions in Syria. Although the potential danger Elfgeeh represented was vast, his impact was also readily identifiable in that he effectively radicalized and recruited multiple individuals to travel overseas for the express purpose of joining ISIL. Elfgeeh's pro-ISIS, pro-jihadist violent ideology was extremely well-developed and long-standing. Undoubtedly, Mr. Elfgeeh was both influential and effective and, but for the detection of his activity, it seems likely he would have been successful in carrying out a domestic attack and sending recruits overseas.

In contrast, Mr. Jalloh's faltering, non-committal actions, while misguided and criminal, nonetheless posed almost no direct threat to American citizens or people abroad. While in Africa he was induced to make an attempt to travel to Libya to join ISIS, but his commitment was shallow and he withdrew on his own. Likewise, unlike Elfgeeh who used his own money to outfit the warriors he recruited and radicalized for war, and his online platforms to explicitly encourage people to fund the ISIL war effort, Mr. Jalloh provided small contributions to pay for living expenses, computer equipment, and travel. Finally, unlike Elfgeeh who actively sought to purchase automatic weapons and silencers to murder American military personnel *by himself*, Mr. Jalloh was pressured to engage in a domestic operation, but refused, but then acquiesced to trying to purchase a weapon. These stark differences are accentuated by three additional distinctions: (1) in contrast to Mr. Jalloh, who had a shallow commitment to jihad and extremist ideology, Elfgeeh's extremist views and ideological commitment to ISIL were deeply entrenched and clearly articulated; (2) in every regard, Elfgeeh was a leader and Mr.

Jalloh a follower; and (3) Elfgeeh's activities reflect sophistication, resourcefulness, initiative, and the capacity to act alone, while Mr. Jalloh's actions evidence the opposite – dependence, a lack of sophistication, and virtually no initiative.

Based on the scope, sophistication, and potential impact of Elfgeeh's criminal activity, there is no reasonable argument his conduct was similar to Mr. Jalloh, an impaired newcomer to ISIL, whose languid activity was unsophisticated, dependent, and ineffective. Indeed, the mere fact Elfgeeh took on a role of prominence within the pro-ISIS international internet community and acted as a recruiter and proselytizer, standing alone makes him significantly more culpable than a mere follower, such as Mr. Jalloh, due to the greater danger he represented, his sophistication and influence.

*United States v. Lutchman,* 6:16-cr-6071 (W.D.N.Y.)

In passing the United States also cites *United States v. Lutchman*, involving a defendant sentenced last week for his conviction on one count of providing material support to ISIL in violation of 18 U.S.C. § 2339B. To the extent the Government is relying on this case, Mr. Jalloh submits it is completely inapposite. Lutchman was an avowed terrorist arrested one day before he carried out his plot to commit a terrorist attack on New Year's eve in 2015. Like Elfgeeh, but unlike Mr. Jalloh, Lutchman was an ardent online supporter of ISIL who provided guidance to terrorist recruits seeking to join the war overseas, and encouraged all Muslims of conscience to take up arms against the infidels including committing domestic attacks in the United States. 6:16-cr-6071, Doc. 31, at 2-3. In conjunction with Abu Issa Al-Amriki, Lutchman planned a domestic attack in Western New York to kill as many people as possible and to film the attack. Thereafter, Lutchman provided Al-Amriki regular updates, and in exchange Al-Amriki promised to provide support for him to and his followers to join ISIL in Libya. *Id.* at 3.

Thereafter, Lutchman enlisted the assistance of others, identified a specific target and the method to conduct the attack, purchased the weapons and supplies for the attack, and discussed how they would release the video after the attack. *Id.* at 3-4. At the time of his arrest, Lutchman, a self-professed Muslim convert, had a criminal history dating back to 2006, that included a conviction for a violent felony offense (Robbery) for which he was sentenced to five years in prison, three parole violations for drug use, assaults, and arson, and three misdemeanors (Criminal Mischief, Petit Larceny, and Menacing). Based on his long criminal history and nature of his offense, Lutchman made no argument in support of a downward departure pursuant USSG § 4A1.3 at sentencing (Doc. 29), and in his remarks to the Court he made clear he was an unformed terrorist. Seth Voorhees, *"There Will Be More Blood" Says Rochester Man Behind New Year's Eve Terror Plot*, Time Warner Cable News, 1/25/17.[1] Lutchman was sentenced to 240 months.

To the extent the Government equates Lutchman to Mr. Jalloh, the comparison falls flat. Much like Elfgeeh, but dissimilar to Mr. Jalloh, Lutchman was a radical Muslim terrorist, with an online presence, capable of initiating and carrying out a terrorist attack on American soil, and possessing the ability to recruit others. In contrast to Mr. Jalloh, who refused to take part in a terrorist operation, but like Elfgeeh, Lutchman planned to carry out a specific terrorist act on a specific date, with a specific methodology, and a specific target. Furthermore, Lutchman was an unrepentant, violent extremist with a long criminal record with no apparent capacity for rehabilitation and no evidence that he would not re-offend.

In contrast, Mr. Jalloh has no criminal history, no history of violence, and has presented compelling evidence that his likelihood of recidivism is low. (Doc. 39, Ex. C.) For these

---

[1] This article is available online at: http://www.twcnews.com/nys/rochester/crime/2017/01/26/emanuel-lutchman-rochester-terror-attack-sentencing.html.

reasons, application of the terrorism related enhancement under USSG § 3A1.4(b) to Mr.

Jalloh's case dramatically over-represents the seriousness of his past criminal conduct and the

likelihood he commit other crimes, and unlike *Lutchman*, the Court is "encouraged" under "§

4A1.3 to depart downward at sentencing." *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir.

2003).

\*   \*   \*

A fair comparison between Mr. Jalloh's case and *Elfgeeh* and *Lutchman* strongly

suggests a term of imprisonment of 78 months is a sentence sufficient, but not greater than

necessary to comply with the purposes of 18 U.S.C. § 3553(a).

## CONCLUSION

For all these reasons, and those stated in his Memorandum in Aid of Sentencing, Mr.

Jalloh respectfully requests that this Court impose a sentence of 78 months.

Respectfully submitted,
Mohamed Bailor Jalloh
By Counsel


_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of February, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John T. Gibbs
Brandon Van Grack
Assistant United States Attorneys
Attorneys for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3775
(703) 837-8242
John.Gibbs@usdoj.gov
Brandon.Van.Grack2@usdoj.gov


                                        _____/s/_____
                                        Joseph T. Flood, VSB #71716
                                        Sheldon, Flood & Haywood, PLC
                                        10621 Jones Street, Suite 301-A
                                        Fairfax, VA  22030
                                        (703) 691-8410
                                        (703) 257-0252 (fax)
                                        jflood@sfhdefense.com